## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-589 (RDM)** |
| | : | |
| **JOSEPH IRWIN and** | : | |
| **JOHN JOSEPH RICHTER,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S AMENDED
## MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS'
## PROPOSED EXPERTS, DR. TIM HOUCHIN AND DR. ROBERT OUAOU

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this amended motion to exclude the testimony of the defendants' proposed experts, Dr. Timothy Houchin and Dr. Robert Ouaou.[1] Although "[t]he concerns underlying the court's role as gatekeeper under *Daubert* are of lesser import in a bench trial . . . the standards of relevance and reliability must still be met." *Stryker Spine v. Biedermann Motech GmbH*, 684 F. Supp. 2d 68, 100 n. 35 (D.D.C. 2010) (citing *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002)). Indeed, federal district courts are still "required to rely only on admissible and reliable expert testimony, even while conducting a bench trial." *See, e.g.*, *Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000) (Gilman, J., dissenting) (listing cases). For the reasons identified herein, the Court should preclude the defendants' proposed expert testimony.

Initially, it bears noting that neither expert disclosure states the subject in which each defendant seeks to qualify his respective expert. ECF 103, 104. However, based on the defendants'

---

[1] As explained further below, the United States files this amended motion primarily to correct an error in its original motion. *See* ECF 125 at 15.

reports, it appears that defendant Irwin is proffering Dr. Houchin as a forensic psychiatrist and defendant Richter is proffering Dr. Ouaou as a neuropsychologist who does forensic evaluations. As described below, these proposed experts should be excluded because they are not qualified to opine on the defendants' purported diminished capacity, and their proposed testimony is inadmissible under Federal Rules of Evidence 403, 702, and 704.

## BACKGROUND

### I.   Factual Background

The defendants' offenses stem from their choice to enter the restricted United States Capitol Grounds and Building on January 6, 2021, including the Senate Floor, while carrying dangerous weapons such as a ten-foot-long wooden flagpole with a metal, spear-like tip, and a thick, whittled wooden pole that Irwin broke into two pieces, one of which became very sharp and stake-like. *See, e.g.*, ECF 98 (Govt Tr. Brief); Trial Tr. 5:21-16:19.[2] For this conduct, the defendants are charged with violating, in relevant part, 18 U.S.C. § 1512(c)(2), Obstruction of an Official Proceeding; 18 U.S.C. §§ 1752(a)(2) and (b)(1), Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon; and 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building. ECF 54.

### II.   Summary of Trial Proceedings and the Government's Video Evidence

A bench trial commenced in this matter on January 22, 2024. After three days of trial, and while still in the government's case-in-chief, the trial was continued. In the first day of trial, defense counsel proffered that the defendants would testify regarding certain events of the day on January 6, 2021. Based on those proffers, the government reviewed additional video footage taken

---

[2] Unless otherwise noted, any reference to a transcript refers to the transcript of the trial that commenced on January 22, 2024.

on January 6, 2021 from the Upper West Terrace and discovered that both defendants were depicted in that video footage. Although this video footage had not been marked as government trial exhibits, it had been provided to the defendants in April 2022 as part of global discovery. Tr. 189:12-18. The video footage shows Irwin marching towards a squad of Metropolitan Police Department ("MPD") officers, stopping in front of them 20-30 feet, and violently wielding his thick wooden pole over his head and towards the officers in a threatening manner as he belligerently directed the officers to "GO HOME!" *See, e.g.*, Exs. 433, 606.

The video evidence further showed that, during this aggressive episode directly in front of the police officers, Irwin slammed the wooden pole into the ground, causing the thick wooden pole to break into two pieces. *Id.* Irwin kept both halves of the pole and carried them with him into the Capitol Building. Ex. 412. The video footage plainly shows Irwin lashing out at the officers while Richter supported close behind, holding his own flagpole (to which he had attached a black American flag that, according to Richter, meant "No Quarter").[3] Exs. 433, 606; Ex. 518 at 497.

---

[3] The Merriam-Webster dictionary defines "no quarter" as "no pity or mercy —used to say that an enemy, opponent, etc., is treated in a very harsh way." *See* https://www.merriam-webster.com/dictionary/no%20quarter.

In addition, the International Committee of the Red Cross website states as follows when discussing the term:  "Quarter (denial of) - This term is used in such expressions as 'to give no quarter' or 'cry quarter'; in regard to hostilities by land, sea or air, denial of quarter means refusing to spare the life of anybody, even of persons manifestly unable to defend themselves or who clearly express their intention to surrender.  International humanitarian law prohibits the use of this procedure, that is, ordering that there shall be no survivors, threatening the adversary therewith, or conducting hostilities on this basis. Denial of quarter is a grave breach of international humanitarian law. ").  *See* https://casebook.icrc.org/a_to_z/glossary/quarter-denial.

Similarly, the Wikipedia entry for this phrase states as follows: "No quarter, during military conflict, implies that combatants would not be taken prisoner, but killed. Since the Hague Convention of 1899, it is considered a war crime; it is also prohibited in customary international law and by the Rome Statute. The Hague Convention of 1907 states that "it is especially forbidden [...] to declare that no quarter will be given." *See*

As discussed at length during trial, this video evidence differed from the defendants' accounts of their conduct on January 6, as provided to the Federal Bureau of Investigation (FBI) during the defendants' interview, and proffered during the defense opening statements. For his part, Irwin recounted to the FBI many details regarding his actions on January 6, including that his "walking stick" snapped in half as he was simply walking and "kind of" stomping on the ground. Richter recounted the day's events in great detail in nearly all respects, yet Richter stated that he "didn't know" how Irwin's "walking stick" had been broken. Ironically, Richter also offered that, if the broken stick had been his, the breaking would have been intentional. *See* Ex. 513-515; *see also, e.g.*, Tr. 150:8-10 (where defense counsel conceded, "[w]e can certainly see the government's argument that it contradicts a fair amount of what was said in opening statements.").

After reviewing this video footage, the government immediately identified these videos for the defense. Tr. 153:7-9. At trial the next morning, the defense informed the Court that they had not previously seen the videos, and that, in light of what defense counsel had proffered during opening statements, "the videos and the screenshots are problematic." Tr. 150:8. Defense counsel moved for a mistrial and asserted that, among other things, they had been ineffective for not hiring experts for their respective clients. *See generally* Tr. January 23-24, 2024. After speaking *ex parte* with the Court, the Court rejected any motion for a mistrial and any assertions of ineffectiveness. *Id.* The Court stated it was "skeptical that an expert of the type that you're talking about would be able to offer testimony that would go to the relevant elements," Tr. 194:5-12, and would "be surprised if there were an expert who would say that the fact that someone was suffering from PTSD would show that they – would provide a basis to conclude that they did not knowingly carry,

---

https://en.wikipedia.org/wiki/No_quarter#:~:text=No%20quarter%2C%20during%20military%20conflict,and%20by%20the%20Rome%20Statute (citations omitted).

for example, a dangerous weapon." *See id.* Irwin's counsel clarified that an expert was needed to opine on memory issues, which the Court pushed back on, stating that "there's not a false statements claim, or there's nothing – there's not a count in this case in which their memory is relevant." Tr. 199:20-22.

The next day, January 24, Richter's counsel then informed the Court, in great detail, what his proposed expert would testify to, despite having reviewed no records or evidence and after having spoken to Richter for one hour only the night prior.[4] Counsel stated the expert would detail

---

[4] Despite having reviewed no documents and having met with Richter briefly by telephone/video only, Richter's counsel stated on the record as follows with respect to Dr. Ouaou's opinions:

> . . . I had Dr. Ouaou conduct what I'm going to call an initial screening interview via telephone with Mr. Richter. My understanding of the status after that is that it was evident from the contact with Mr. Richter that his history of traumatic brain injury, his post-traumatic stress disorder are extremely debilitating. Mr. Richter is permanently disabled and receives benefits through the Veterans Affairs Medical Center for brain injury and PTSD related to combat service; over two 15-month tours in the Iraq war. . . .

> Mr. Richter evidences severe symptoms consistent with blasts, neurotrauma, traumatic brain injuries, and PTSD.

> The recognized deficits include decision-making, memory, reasoning, as well as anxiety, insomnia, diminished concentration. And those deficits have resulted in significant diminishment in his ability to manage his independent activities of daily living.

> . . . Mr. Richter's cognitive deficits, i.e., memory and executive functioning, which are commonly disrupted in traumatic brain injury, likely lead to the production of false memories, sometimes referred to as confabulation, as well as diminished attention, comprehension, and problem-solving . . . those disabilities may make him less able to participate effectively in his own defense.

> . . . it is Dr. Ouaou's opinion, based on screening, that it is imperative, based on medical and psychological expertise, that Mr. Richter undergo a comprehensive neuropsychological evaluation to objectively measure the impact of the above cognitive deficits on his functional capacities. My understanding is that an evaluation would require that Mr. Richter undergo several hours of face-to-face

Richter's "cognitive deficits, i.e., memory and executive functioning[.]" Tr. 418:21. When the Court asked how this testimony would address the elements of the crimes charged, counsel responded that Richter's cognitive deficits impacted his "intent to use portions of the flagpole as a weapon . . . under the carry definition." Tr. 420:7-19. After the Court pointed out that Richter's understanding of 18 U.S.C. §1752(b)(1)'s intent element was incorrect, counsel for Richter replied that "[e]qually clearly from opening statements, Mr. Richter is a critical and perhaps the primary witness in support of our challenges to the necessary elements of the 1512 and 1752 counts," Tr. 421:25-422:4, and if he denied recalling that Irwin swung his "walking stick" at the police officers and smashed it, the government would argue that Richter's lack of memory was "convenient and self-serving to the point of absurdity, and I would have no evidence to contradict that." Tr. 423:12-17. Therefore, a mental health expert was needed to, in essence, bolster Richter's credibility. Tr. 425:17-21.

Irwin's counsel stated that the "element of the offenses" his expert would address was Irwin's "credibility," since Irwin also planned to testify. Tr. 428:1-14. She further stated she now also believed, despite a prior contrary statement, that there may be a diminished capacity argument relevant to Irwin's 18 U.S.C. § 1752(b)(1) charge because he was purportedly in the throes of a

_____

assessment with a battery of neuropsychological tests and interview and a review of relevant records.

Tr. 417:23 - 419:11. Curiously, Dr. Ouaou's opinions as expressed in his report appear largely unchanged from those gleaned during his one hour telephone interview, despite that he purportedly (1) administered "a comprehensive neuropsychological evaluation to objectively measure the impact of the above cognitive deficits on his functional capacities of a number of objective cognitive function tests," and (2) reviewed more than 1,400 pages of Richter's VA medical records.

PTSD episode when he swung and smashed the wooden pole in front of the officers. Tr. 431:12-16.

The Court stated that it understood the defendants' argument to be that "maybe there might be some tangential connection to the corrupt state of mind," and that defendants planned to testify, so any mental health expert's testimony would go to the defendants' "credibility." Tr. 434:5-18. The Court also suggested a stipulation, to which the government agreed, that "people with PTSD or traumatic brain injury have memory lapses and those memory lapses occur more frequently when they're under stressful situations or whatever it is that the defense might be trying to offer the witnesses to say . . . maybe there's not a need to call the witnesses if there's agreement among the parties as to a fact." Tr. 446:7-15.

Nonetheless, defense counsel indicated that a continuance was necessary to remedy Constitutional inadequacies and that time was needed to proffer expert testimony. 464:24-465:18. Clarifying for a final time what the experts would testify to, counsel for Richter and Irwin made clear that their experts' testimonies would go to the defendants' credibility. Tr. 453:15-454:4, 459:10-21, 465:21-25.

## APPLICABLE LAW

Federal Rule of Evidence 702, which governs the admissibility of expert testimony at trial, provides that an appropriately qualified witness may testify in the form of an opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Rule 702 further requires that the testimony be: (1) based on sufficient facts or data; (2) the product of reliable principles and methods; and (3) that the proposed expert reliably applied the principles and methods to the facts of the case. *Id.*; *see also Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1995). The party proposing the

expert testimony bears the burden of showing that the testimony satisfies Rule 702. *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 (D.C. Cir. 2001).

Thus, when evaluating whether a proffered expert's testimony is admissible, the Court's first task is to determine whether the expert is qualified to offer an opinion on the issue at hand based on their "knowledge, skill, experience, training, or education[.]" *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 894 (D.C. Cir. 2010). If the expert is qualified, the Court must then conduct a two-pronged inquiry to determine whether the proffered evidence is both reliable and relevant. *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996).

The presentation of mental health evidence is further limited by the Federal Rules of Evidence and the Insanity Defense Reform Act (IDRA), 18 U.S.C. § 17(a). First, under Federal Rule of Evidence 704(b), "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Second, the IDRA restricts the use of evidence of a mental disease or defect at trial to when a defendant presents an affirmative defense of insanity. 18 U.S.C. § 17(a). However, a narrow exception to the IDRA's general rule prohibiting mental health evidence absent an insanity defense exists when "the evidence is admitted not as an affirmative defense to excuse the defendant from responsibility for his acts, but to negate specific intent when that is an element of the charged act itself" so long as "the expert limits his testimony to his 'diagnoses, the facts upon which those diagnoses are based, and the characteristics of any mental diseases or defect the experts believe the defendant possessed during the relevant time period,' staying clear of 'directly or indirectly opining on the [ultimate] issue of specific intent[.]'" *United States v. Childress*, 58 F.3d 693, 728 (D.C. Cir. 1995) (internal citations omitted). Therefore, to be admissible under this narrow exception, mental health evidence must "establish a

link or relationship between the evidence and the mens rea at issue in the case." *United States v. Davis*, 78 F. Supp. 3d 17, 20 (D.D.C. 2015), *aff'd,* 863 F.3d 894 (D.C. Cir. 2017).

Appropriately, courts closely scrutinize psychiatric evidence. "Courts may exclude relevant psychiatric evidence under Rule 403 [b]ecause psychiatric evidence (1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract the jury's from focusing on the actual presence or absence of mens rea, and (3) may easily slide into wider usage that opens up the jury to theories of defense more akin to justification." *United States v. Rogers*, 2006 WL 5249745, at *6 (D.D.C. July 17, 2006); *see also*, *United States v. Davis*, 863 F.3d 894, 908 (D.C. Cir. 2017) (exclusion of evidence showing ADHD); *United States v. Lilley*, 2017 WL 7048806, at *5 (6th Cir. July 26, 2017) (same for dyslexia, depression, and anxiety); *United States v. Andrews*, 811 F. Supp. 2d 1158, 1172 (E.D. Penn. 2011) (same for bipolar disorder); *United States v. Pohlot*, 827 F.2d 889, 905 (3d Cir. 1987) (exclusion of evidence showing personality disorder).

## ARGUMENT

The Court should exclude the defendants' proposed expert testimony because the experts are not qualified to offer the proffered opinions under Federal Rule of Evidence 702, and their testimony is inadmissible pursuant to Federal Rules of Evidence 403, 702, and 704.

### I.   The Experts Are Not Qualified To Opine On Irwin And Richter's Alleged Post Traumatic Stress Disorder, Traumatic Brain Injury, And Associated Symptomology Under Rule 702.

Neither Dr. Houchin nor Dr. Ouaou are qualified to testify regarding Irwin and Richter's alleged mental conditions. "[T]he extent of the expert's qualifications is a factor in determining whether that opinion is sufficiently reliable to be admissible." 29 Wright & Miller, Fed. Prac. & Proc. § 6264.1 (2d ed. 2022). Because neither expert possesses the requisite "knowledge, skill, experience, training, or education," related to the matters on which they are to opine—PTSD,

Traumatic Brain Injuries (TBI), and whether such alleged conditions impacted the defendants with respect to January 6, 2021—Dr. Houchin and Dr. Ouaou's expert testimony must be barred as inadmissible, unreliable, and unhelpful. *See* Fed. R. Ev. 702.

### A. Dr. Houchin for Defendant Irwin

> #### i. Dr. Houchin Lacks the Specialized Knowledge and Training Necessary to Provide the Proffered Opinions.

Initially, Irwin's disclosure for Dr. Houchin fails to state the subject in which he seeks to qualify Dr. Houchin as an expert. ECF 103.[5] Irwin's disclosure states that Dr. Houchin will opine on the following: (1) whether Irwin suffers from PTSD; (2) whether Irwin suffered a PSTD reaction on January 6, 2021 that affected his conduct on that day; and (3) whether PTSD or other conditions impacted his *memory* of a single event on that day: Irwin violently swinging his wooden pole at MPD officers while belligerently screaming at them to "GO HOME!" as depicted in Exhibit 601. ECF 108.

Dr. Houchin is not qualified to testify in these areas. To start, Dr. Houchin is a clinical psychiatrist that focuses on child and adolescent psychiatry, as the website for his practice indicates: "360 Mental Health's clientele involve families with children because there is such a critically unmet need for evaluations that draw upon Dr. Tim's unique areas of expertise."[6] Dr. Houchin's CV reveals no specialization or training related to PTSD or its diagnosis, no certifications, publications, lectures related to PTSD, and no experience working with the Veterans Administration, the military, or veterans. ECF 103-1. Assuming he is being proffered as forensic psychiatrist, the branch of psychiatry that deals with issues arising in the interface between

---

[5] The government's expert believes Dr. Houchin is being proffered as a forensic psychiatrist.
[6] *360 Mental Health services*, available at https://www.360mentalhealth.com.

psychiatry and the law, Dr. Houchin has not testified in federal court in the last five years, let alone

testifying as a mental health expert on PTSD, TBI, or related issues. ECF 103-1.

Perhaps more importantly, Dr. Houchin is neither a psychologist nor a neuropsychologist;

therefore, he does not possess any specialized knowledge of how brain conditions, including PTSD

and/or TBI, affect a person's behavior and cognitive skills, including a person's tendency to

dissociate or to forget events. He also is not trained in objective assessment of symptoms or validity

reports, and thus is not trained to conduct independent diagnostic testing of whether an individual

suffers from PTSD or TBI, which he concedes in his report: the problems caused by TBI "can be

objectively quantified with neuropsychological testing by a qualified Ph.D. psychologist," which

Dr. Houchin is not. ECF 108 at 8.

Despite these gaps in knowledge and training, Irwin proffers Dr. Houchin to opine on

whether Irwin suffers from PTSD—a fact that is readily ascertainable to a layperson from his

medical records—and whether Irwin's PTSD and TBI affected his conduct on January 6, 2021 and

his memory with respect the only episode on January 6 he claims to have forgotten, the 40-second-

long pole-smashing event. ECF 108.

> ii.  *Reporting and Testimony on Irwin's Purported Traumatic Brain Injury*
> *Must be Excluded Because It was not Disclosed in Irwin's Rule 16*
> *Disclosure.*

Additionally, Irwin's initial and supplemental disclosures made no mention of traumatic

brain injury (TBI) or opinions thereon; thus, references to TBI in Dr. Houchin's report and any

testimony on this subject, should he be permitted to testify at trial, must be stricken and excluded

because it was not included in Irwin's Rule 16 disclosure. *See* ECF 103, 105; Fed. R. Crim. Pro.

16(b)(1)(C)(iii) ("The disclosure for each expert witness must contain . . . a complete statement of

all opinions [and] . . . the bases and reasons for them[.]"); 16(d)(2)(c) (noting that if a party fails

to comply with Rule 16's disclosure requirements, the court should "prohibit that party from introducing the undisclosed evidence."); *see also, e.g.*, *United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008) (holding that the district court was correct to exclude testimony that did not meet the Rule 16 standard).

### B.  Dr. Ouaou for Defendant Richter

#### i.  *Dr. Ouaou Lacks the Specialized Knowledge and Training Necessary to Provide the Proffered Opinions*

Richter's disclosure for Dr. Ouaou similarly fails to state the subject in which he seeks to qualify Dr. Ouaou as an expert. ECF 104.[7] Dr. Ouaou's report focuses almost exclusively on Richter's purported cognitive issues which, Dr. Ouaou opines, impact his memory. Specifically, Dr. Ouaou opines that (1) Richter has a history of improvised explosive devices (IED) blast neurotrauma, which Dr. Ouaou concedes is only known through Richter's self-reporting; (2) there are indications Richter suffered from cognitive, emotional, and behavioral impairments that were present at the time of the offense; and, (3) Richter's cognitive deficits more likely than not make him susceptible to memory distortion and confabulation in recall memory. ECF 107-1 at 9.

Dr. Ouaou provides these opinions despite that (1) he is not board certified in neuropsychology or forensic psychology, (2) he does not appear to have completed the requisite didactics as a forensic psychologist, and (3) his only training in forensic psychology appears to be (a) when he was overseen by a board-certified forensic psychiatrist fifteen years ago, from 2006 to 2008 (ECF 104-1 at 2), and (b) some individual continuing education/training program (ECF 104-1 at 1).

---

[7] It appears that Dr. Ouaou is being proffered as a neuropsychologist who does forensic evaluations.

Similarly, although Dr. Ouaou appears to have worked at a VA facility, it was nearly thirty years ago and only for one year, 1994-1995, which was well before Richter did his two Iraq tours in 2004 and 2006, and before the use of IEDs became prominent in/around 2003.[8] *Id.* Thus, Dr. Ouaou is hardly specialized in treating or assessing military veterans suffering from trauma related to purported IED blasts. Furthermore, Dr. Ouaou's CV lists no specialization or training related to PTSD or its diagnosis, and no certifications, publications, or lectures related to PTSD, despite running his own practice for fifteen years, Naples Neuropsychology, P.A. *See* ECF 104.

Finally, despite presumably understanding the required disclosure obligations to testify as an expert witness, having been proffered over 150 times,[9] Dr. Ouaou failed to provide the government with his handwritten notes from his evaluation of Richter and the raw data from the objective testing he administered on him. *See* ECF 114. Notably, *after* the government filed its Emergency Motion to Compel Defendant Richter to Provide Immediately Dr. Ouaou's Notes and Raw Testing Data (*id.*), Dr. Ouaou then amended his expert report (ECF 116) to correct a significant error with respect to Richter's score on an auditory memory test.[10]

---

[8] *See* Department of Homeland Security "IED Attack Fact Sheet," available at: https://www.dhs.gov/publication/ied-attack-fact-sheet#:~:text=IED%20Attack%20Fact%20Sheet%3A%20Improvised%20Explosive%20Devices&text=IEDs%20can%20be%20carried%20or,War%20that%20began%20in%202003 ("IEDs can be carried or delivered in a vehicle; carried, placed, or thrown by a person; delivered in a package; or concealed on the roadside. The term IED came into common usage during the Iraq War that began in 2003.").

[9] *See United States v. deBerardinis*, No. 18-CR-00030-01, Hr'g on Competency Tr. Vol I, 148 (Dec. 20, 2019) (where Dr. Ouaou stated he been tendered and qualified or attempted to be qualified as an expert witness in court proceedings "probably 150 times").

[10] In Dr. Ouaou's original expert report, he reported Richter as having scored a 74 on the test, which would have placed Richter in the "borderline range." *Id.* at 19. After the government moved to compel the raw data, however, Dr. Ouaou corrected his expert report to conform with the raw data, which showed that Richter's actual score on that test was an 88, which placed him in the "low average range" – a significant change. *Id.*

For all these reasons, this Court should question whether his "scientific, technical, or other specialized knowledge" will assist this Court in "understand[ing] the evidence or to determine[ing] a fact in issue." Fed. R. Evid. 702.

### ii. Other Courts Have Held That Dr. Ouaou Lacks Credibility

Dr. Ouaou's credibility has been questioned in previous cases. For example, similar to here, one federal district court questioned Dr. Ouaou's credibility when he attempted to provide expert testimony in forensic neuropsychology, despite that he did not appear entirely qualified to do so. That court stated as follows when analyzing competing expert testimony, and ultimately found the opposing expert to be more credible than Dr. Ouaou: "even though Dr. Ouaou was called upon to testify as an expert in forensic psychology, his curriculum vitae omits many of his forensic experiences. When questioned on this, Dr. Ouaou did not offer an explanation. Moreover, although Dr. Ouaou testified that he had in fact received specialized training in forensic neuropsychology, his curriculum vitae was vague and confusing on this point." *United States v. Deruiter*, 2017 WL 9360880, at *23-24 (M.D. Fla. May 16, 2017), *report and recommendation adopted*, 2017 WL 3308967 (M.D. Fla. Aug. 3, 2017).

Similarly, the court in *United States v. Raiola* found "that the testimony and opinion of Dr. Ouaou are not entirely credible." 2016 WL 11220474, at *17 (M.D. Fla. Dec. 21, 2016), *report and recommendation adopted*, 2017 WL 218830 (M.D. Fla. Jan. 19, 2017). There, Dr. Ouaou spent double the amount of time with the defendant than the opposing expert. *See id.* And, both sides agreed that the defendant had tested poorly on certain cognitive tests, which were performed to assess his competence to stand trial. *See id.* Nonetheless, the Court still found the defendant was competent, and found the opposing expert more credible than Dr. Ouaou because Dr. Ouaou failed

to acknowledge "significant caveats" in his findings, and because he failed to credibly assess the

*objective* evidence:

> Specifically, Dr. Ouaou testified that a history of brain injury and bad memory do not *ipso facto* result in incompetence. Moreover, Dr. Ouaou only opined that Defendant is incompetent in this particular case because there is an extensive amount of documents and because the case is complicated. Dr. Ouaou conceded that his opinion concerning competence would change if this case was just a simple fraud case or if there were simpler allegations. As the Government pointed out, none of these concessions were set forth in Dr. Ouaou's report. Dr. Ouaou's failure to address or acknowledge these significant caveats in his report undermines the credibility of his ultimate conclusions.

> Moreover, while objective testing administered by Dr. Ouaou showed that Defendant has significant cognitive defects, the Court agrees with the Government that "test results themselves don't provide that answer." Rather, it is "the expert's analysis of the test results and extrapolation of those test results that matters."

*Id.* (record citations omitted). The Court then concluded that the opposing expert's "analysis of the

objective results [was] more credible and, therefore, entitled to greater weight" than Dr. Ouaou's.

*Id.*

Again in *United States v. Madison*, the Magistrate Judge not only found "the

neuropsychological testing conducted by Dr. Ouaou, and Dr. Ouaou's opinions related thereto" to

be "less credible[,]" but the judge also discredited another, entirely separate expert due to his

"exclusive reliance" on the testing Dr. Ouaou had performed. 2020 WL 8461574, at *36 n. 58

(M.D. Fla. Oct. 29, 2020), *report and recommendation adopted*, 2020 WL 7768460 (M.D. Fla.

Dec. 30, 2020), *aff'd*, 2022 WL 4298175 (11th Cir. Sept. 19, 2022). The District Court then

affirmed, stating the judge had "found Dr. Ouaou inconsistent and biased for the Defense."

*Madison*, 2020 WL 7768460, at *5.

Perhaps most notably, the court in *United States v. DeBerardinis* held as follows after Dr. Ouaou and the defendant's other expert both opined that the defendant was incompetent to stand trial:[11]

> Defendant's experts testified that he suffers from conditions that can cause confabulations or delusions, and Dr. Ouaou opined that Albert Saiah is such a delusion. The undersigned is more persuaded by the testimony of Dr. Browning that this is possible but extremely unlikely. It is particularly unlikely that the only delusions an otherwise functional adult has ever had are those that served the purpose of his complex, multimillion-dollar fraud. And there is no indication that Defendant exhibits similar delusions in other aspects of his life.

*United States v. deBerardinis*, No. 18-CR-00030-01, 2020 WL 2153526, at *14 (W.D. La. Apr. 3, 2020), *report and recommendation adopted*, No. CR 18-00030-01, 2020 WL 2130996 (W.D. La. May 5, 2020).

For all of these reasons, both defendants' testimony should be excluded as unreliable and inadmissible because the experts are not qualified and are otherwise not reliable. Their testimony should also be excluded because their "scientific, technical, or other specialized knowledge" will not assist this Court in "understand[ing] the evidence or to determine[ing] a fact in issue." Fed. R. Evid. 702.

## II.   The Experts' Proffered Testimony Should Be Excluded As Irrelevant and Prejudicial, and Because It Does Not Negate Any Specific Intent Elements

If an expert is qualified to testify—which Dr. Houchin and Dr. Ouaou are not—then under *Daubert*, the Court is next required to address two questions before permitting expert testimony: "first whether the expert's testimony is based on 'scientific knowledge,' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Meister*, 267

---

[11] The United States files this amended motion in order to correct the error in its original motion, where the government inadvertently attributed to Dr. Ouaou the testimony of the defendant's other expert, Dr. Woods. *See* ECF 125 at 15. The error was unintentional, and the attribution has been deleted from the government's amended motion.

F.3d at 1126. As noted above, the proposed evidence need only be permitted if it will assist the trier of fact in understanding the evidence or resolving a disputed fact. *See* Fed. R. Evid. 702. For mental health testimony and evidence, the court must determine whether there is a "link or relationship between the specific psychiatric evidence offered and the mens rea at issue in the case." *Childress*, 58 F.3d at 730. If the evidence does not establish such a link, it should be excluded. *Davis*, 78 F. Supp. 3d at 20. And even if mental health evidence or expert testimony is relevant, it may be excluded under Rule 403 if it is confusing or prejudicial. *Rogers*, 2006 WL 5249745, at *6.

Under Federal Rule of Evidence 702, "the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592; *see also Young v. Burton*, 567 F. Supp. 2d 121, 128 (D.D.C. 2008), *aff'd*, 354 F. App'x 432 (D.C. Cir. 2009) ("In so doing, 'the district court must engage in 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'") (internal citations omitted)). This "inquiry forces the court to focus on 'principles and methodology, not on the conclusions that they generate,' and thus demands a grounding in the methods and procedures of science, rather than subjective belief or unsupported speculation." *Meister*, 267 F.3d at 1127 (internal citation omitted). There are "four factors for courts to consider in evaluating scientific validity, focusing on whether the theory or technique had been tested, whether it had been subjected to peer review and publication, the method's known or potential error rate, and the method's general acceptance in the scientific community." *Id.*

The experts' proffered testimony here fails to clear all of the hurdles and is thus inadmissible under Federal Rules of Evidence 702, 704, and 403. First, the experts' opinions are not grounded "in the methods and procedures of science," in part because neither expert attempted to confirm the veracity of each defendant's self-serving, self-reported statements. For example, neither expert sought or reviewed service records from the Army to confirm that the defendants' records showed that they had reliably recounted their time in the military and thus exhibited no signs of cognitive impairment on this score.  More egregiously, these evaluations were supposed to be *forensic* evaluations to assess defendants' functioning during a very specific time period: in/around January 6, 2021. Although both evaluators had access to underlying records corresponding to that time period, neither expert summarized the relevant records and neither expert did a write up regarding the defendants' interviews during that time period. These deficiencies fall below the standard of practice for rendering mental health opinions regarding the defendants' mental capacities on January 6.

Furthermore, the experts' opinions do not state, suggest, imply, or otherwise opine that any asserted mental health issues prevented either defendant from knowing about Congress' certification proceeding, intending to obstruct that proceeding, or carrying their weapons with the intent that they be used in a manner capable of causing serious bodily injury or death. Therefore, the proffered testimony is inadmissible bolstering as to defendants' credibility and could only serve to confuse the relevant inquiry. For these additional reasons, the experts' testimony should be excluded.

### A. The Experts' Proposed Testimony Is Not Grounded In The Methods and Procedures of Science, As Is Required By Federal Rule of Evidence 702

#### i. Dr. Houchin's Expected Testimony Should Be Excluded Because He Ignored the Available Objective Evidence.

"Rule 702 also precludes [an expert] from offering opinion testimony based on personal opinions rather than on relevant objective standards." *Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 30 (D.D.C. 2007). But Dr. Houchin's opinions do just that.

First, Dr. Houchin's findings are primarily based on Irwin and his wife's self-reporting, not independent testing or a fulsome records review. Indeed, the report notes that "[p]rior to my in person evaluation of Mr. Irwin, I had not been able to review the videos and transcript I was forwarded by his defense attorney. Therefore I asked Mr. Irwin to explain the entire situation to me during our nearly 2 ½ hour forensic interview." ECF 108 at 2. Thus, with respect to the events of January 6, Dr. Houchin's "findings" amount only to an unsupported, subjective opinion based on Irwin's self-serving account of that day, perhaps supplemented with Irwin's wife's observations, who is clearly biased in his favor and who did not purport to be at the Capitol on January 6.

Moreover, the only "objective" records Dr. Houchin reviewed were portions of Irwin's VA records that were hand-selected by Irwin or his attorney, which Irwin had previously provided to the government as his "mitigation package." Thus, even the "objective" records Dr. Houchin reviewed were not fulsome and were excerpted to paint Irwin's health issues in the light most favorable to him. On this basis alone, Dr. Houchin's testimony should be excluded.

Second, Dr. Houchin's opinions on Irwin's symptomology diverge from the objective evidence, and are not, therefore, based on "scientific knowledge." As noted above, the hand-selected VA records are not fulsome: despite Irwin purportedly serving in the U.S. Army from

1997 through 2010, his VA records contain outpatient notes beginning only in 2012. Nonetheless, even the self-selected portions of Irwin's medical records reveal that Dr. Houchin's opinions are not supported by those records: the medical records show that (1) Irwin never underwent any neuropsychological testing to determine whether he suffered from TBI, (2) he was never diagnosed for TBI, despite his self-reporting to that effect, (3) at no time was he diagnosed with any cognitive disorders, (4) in 2019, Irwin denied having flashbacks, depersonalization, or derealization due to his PTSD, (5) prior to and on January 4, 2021, dissociative tendencies were never identified, and (6) at no time was Irwin ever diagnosed with or identified as having cognitive/memory issues. For example, during Cognitive Processing Therapy, which Irwin attended from May 2021 through August 2021, his recent and remote memory were found to be satisfactory. *Id.* at 7. And none of the VA records from 2021 identified any cognitive/memory issues or episodes of disassociation. *Id.*

Yet, Dr. Houchin opines that "VAMC records *clearly document* that Mr. Irwin suffered a [TBI] [which are] . . . often the underlying cause of a whole host of symptoms and even diagnoses [and are] . . . well-known to cause problems with patients' thinking, memory, emotions and behaviors." ECF 108 at 8 (emphasis added). He also opines that Irwin's PTSD caused him, on January 6, to experience "a dissociative reaction . . . [b]ased on previous history," "distorted views of his surroundings," and distorted memories. *See id.* at 9. He further opines that "Mr. Irwin's PTSD reaction resulted in a disassociative state[.]" *Id.*

Dr. Houchin's opinions are also contrary to other objective evidence, which he appears to have ignored entirely. For example, Dr. Houchin's opinions ignore Irwin's interview with the FBI, where he accurately and specifically recalled many details regarding his conduct on January 6. *See* Ex. 513-514. Dr. Houchin also ignores objective evidence in the form of various trial exhibits,

such as photographs taken by Irwin on January 6, where, before and after the pole-smashing/purported PTSD event, he appears calm, collected, and even smiling. Dr. Houchin also ignores the objective evidence of Irwin's conduct following January 6, where he demonstrated that his memory and understanding of his conduct that day was perfectly intact: he expressed clear understanding and appreciation of his actions and their consequences, from noting he could go to jail and trial, to requesting people delete pictures of him, to writing Mr. Richter about their plan, and then not mentioning Mr. Richter when interviewed by the FBI.

As the above shows, Dr. Houchin's report is not based on reliable, scientific "principles and methodology" that are grounded "in the methods and procedures of science, rather than subjective belief or unsupported speculation." *Meister*, 267 F.3d at 1127. His testimony must, therefore, be excluded under Federal Rule of Evidence 702.

      ii.   *Likewise, Dr. Ouaou's Expected Testimony Should Be Excluded Because He Either Ignored or Misconstrued the Available Objective Evidence.*

Dr. Ouaou's opinions are as deficient as Dr. Houchin's, and for many of the same reasons. Dr. Ouaou's opinions are not supported by, and at times in conflict with, Richter's medical records. Richter joined the U.S. Army in 2002, yet the medical records, again, are not fulsome because they only span from 2012-2024. Nonetheless, the records show that (1) since 2012, Richter did not report acute PTSD issues and no cognitive disorders were identified, (2) he did not report reexperiencing or reliving any traumatic events he experienced in the military, (3) no reports of flashbacks or dissociation were noted, (4) cognition following mental examinations was always reported as intact, (5) Richter's memory, attention, concentration, and speech were always reported as intact, and (6) Richter was able to perform all activities of daily living with independence.

Indeed, Richter never underwent any neuropsychological testing to determine whether he suffered from TBI, he was never diagnosed for TBI (despite his self-reporting to that effect), and

at present, Richter's objective medical records from 2022 and 2023 demonstrate that Richter did not report any significant mental health complaints associated with PTSD other than nightmares. Despite this, Dr. Ouaou opines in passing that Richter's score on the "PTSD Checklist--Military Version (PCL-M)," a self-reported PTSD evaluation, indicated he had PTSD. ECF 107-1 at 8. Curiously, Dr. Ouaou does not otherwise discuss Richter's PTSD symptomology or PTSD's impact on Richter's behavior except with respect to its impact on Richter's *memory*.

Similarly, Dr. Ouaou relies exclusively on Richter's self-serving reports for his primary opinions surrounding Richter's purported memory and other cognitive issues resulting from IED-blast trauma. Yet a review of Richter's entire set of VA medical records shows that his memory was rated as "satisfactory," "intact," or a similar term approximately 170 times from 2012 to 2024.

Dr. Ouaou opines that "individuals with [Richter's] neurological and psychiatric history are often poor historians because of their cognitive vulnerabilities (i.e., memory consolidation) especially during episodes of heightened emotion and external stimuli." ECF 107-1 at 9-10. He further opines that Richter "exhibited difficulties with executive functions and memory" in the neuropsychological testing Dr. Ouaou administered. *See id.* at 10. However, the actual testing results tell a different story. For example, Dr. Ouaou's testing found that Richter's "immediate/memory span" and his immediate memory, as assessed by the California Verbal Learning Test – Third Edition (CVLT-3), were both within the average range. ECF 107-1 at 5-6. Furthermore, and consistent with a Court's prior findings, Dr. Ouaou failed to acknowledge "significant caveats" in his findings, which would bear on the reliability of his opinions. *See United States v. Raiola*, 2016 WL 11220474, at *17 (M.D. Fla. Dec. 21, 2016) (discrediting Dr. Ouaou due to his failure to "acknowledge significant caveats" in his expert opinions). For example, Dr. Ouaou failed to acknowledge that a comparison between his own testing scores and Richter's prior

scores on those same tests produced anomalous results. Had he done so, one would have expected him to identify the following: in 2009—closer in time to any purported IED-blast trauma—Richter was given the Wechsler Adult Intelligence Scale test, where he scored a 103. Yet when Dr. Ouaou administered the same test, Richter's score was 96. Not only did Dr. Ouaou neglect to flag these discrepancies, but he failed to acknowledge that certain of the results, particularly the test revealing a significantly decreased processing speed from 2009 to 2024, can be suggestive of feigned deficits or can be due to an external factors, such as chronic marijuana use, which Richter's medical records indicate (as do his texts with Irwin, *see generally* Ex. 518). Likewise, in the "Symptom Validity/Malingering" section of his report, Dr. Ouaou opines that on multiple tests of Richter's effort and motivation, Mr. Richter performed within normal limits. ECF 107-1 at 5. But Dr. Ouaou failed to note that the tests he administered do not assess effort or motivation, and he failed to administer any symptom validity testing, which is the correct test to determine whether a subject is honestly reporting symptomatology.

Similarly, despite being specifically asked to conduct a forensic evaluation of Richter, Dr. Ouaou also failed to note in his report that he did not ask Richter in that evaluation about his mental state or recollection from January 6, 2021. In fact, Dr. Ouaou failed to include *any reference* to the forensic information he elicited from his interviews with Mr. Richter. *See id.* Like Dr. Houchin, Dr. Ouaou also failed to acknowledge that he, too, did not compare the forensic information gathered from his interview with the other available categories of objective evidence, such as (a) Richter's video-recorded interview with the FBI, where he accurately and specifically recounted in great detail the specifics of his conduct on January 6, *see* Ex. 515-514, (b) other available trial exhibits, such as photographs and videos from the 6th, where, before and after the pole-smashing event that Richter conveniently "forgot," Richter appears calm, collected, and even

smiling, *see* Ex. 500 Series, and, (c) text message evidence between Irwin and Richter where Richter expresses a clear understanding and appreciation of his actions and their consequences, particularly as Irwin orders him to delete evidence of their crimes. *See id.* at 20.[12]

As all of the above shows, these experts' opinions are not grounded "in the methods and procedures of science," and should thus be excluded.

### B. The Experts Must Be Excluded Because Their Proposed Testimony Fails to Address Any Elements Of the Specific Intent Crimes Charged.

Here, neither expert identifies how their diagnoses of the defendants negates any elements of the specific intent crimes charged. The testimony should thus be excluded on this additional basis.

Expert testimony concerning a criminal defendant's alleged mental illness is admissible in only very limited circumstances. Such testimony is admissible if it is offered: (1) in support of a plea of insanity; or (2) to negate the *mens rea* element of an offense. *See Pohlot*, 827 F.2d at 896-97. This argument is only available for specific intent offenses, as "[d]iminished capacity evidence may not be used to negate the *mens rea* of a general-intent crime." *United States v. Coleman*, No. 21-cr-210 (RDM), 2023 WL 7173873, at *7 (D.D.C. Nov. 1, 2023).

Evidence regarding a defendant's mental condition is only admissible to establish diminished capacity if "adequately keyed to the issue of whether [the defendant] entertained the *mens rea* required for proof of the crime." *United States v. Davis,* 863 F.3d 894, 907 (D.C. Cir. 2017) (alteration in original) (quoting *United States v. Childress,* 58 F.3d 693, 729 (D.C. Cir. 1995)

---

[12] Contrary to Richter's assertion that "[t]he government [ ] never identified to undersigned counsel which text exchanges were provided to Dr. Askenazi, nor has the government identified which videos and photos from the U.S. Capitol were provided to" her (ECF 126 at 8), the government's rebuttal expert report specifically included an index listing by exhibit number all materials reviewed by its expert. *See* ECF 121 (filed under seal) at 19, 44 ("Dr. Askenazi - Govt Expert Rebuttal Report - Index of Materials Reviewed").

(noting that "[w]hile [the defendant's] mental capacity does not 'excuse' him from culpability for his activity . . . it may well be relevant to whether the government proved an element of" the crime)). A court's focus must be "on the proffered link or relationship between the specific psychiatric evidence offered and the *mens rea* at issue in the case." *Childress*, 58 F.3d at 730.

For example, in a case involving mail fraud charges, one court in this District excluded the defendant's proffered mental health expert, holding as follows:

> Here, [the expert's] opinions concerning Rogers' capacity and susceptibility could easily mislead the jury into exactly the kind of diminished capacity defense that the IDRA sought to forbid, and that risk substantially outweighs the testimony's limited relevance. This is especially so since the testimony does not establish an inability to deceive, the nub of a *mens rea* defense here. It may well be that Rogers was working beyond capacity, but that goes no distance toward negating the proposition that he could and did intentionally make the affirmative misrepresentations alleged in the indictment with the intent to deceive.

*United States v. Rogers*, No. 05-292 (RWR), 2006 WL 5249745 at *17 (D.D.C. 2006) (citing, *e.g.,* *Childress*, 58 F.3d at 730). The same is true here.

Irwin and Richter are charged with violating three specific intent statutes: 18 U.S.C. §§ 1512(c)(2), 2 – Obstruction of an Official Proceeding; 18 U.S.C. §§ 1752(a)(2) and (b)(1) – Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon; and 40 U.S.C. § 5104(e)(2)(D) – Disorderly Conduct in a Capitol Building.[13] The specific intent elements of those crimes surround (1) whether the defendants' intended to obstruct or impede an official proceeding or the orderly conduct of Government business or official functions, (2) for the Section 1512 charge only, whether they possessed corrupt intent, meaning, whether they acted with an unlawful means or an unlawful purpose (or both), and whether they had consciousness of wrongdoing, and (3) whether the defendants carried their weapons with the

---

[13] The government notes that both defendants conceded during their openings that they were guilty of violating 40 U.S.C. § 5104(e)(2)(D). *See generally* Jan. 22, 2024 Tr.

intent that they be used in a manner *capable* of causing serious bodily injury or death. *See, e.g.*, *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002) ("For an object that is not inherently deadly, the govern [must prove that] . . . the object must be capable of causing must be capable of causing serious bodily injury or death to another person and the defendant must use it in that manner."); *United States v. Middleton, et al.*, 21-cr-00367 (RDM), ECF 128 (proposed final jury instructions on Section 1512 and 1752 charges).

Here, neither expert opinion states that Irwin or Richter possessed a mental health condition that would negate any of these elements. Neither expert opines that the defendants' PTSD or TBI negated their ability to know about, understand, and intend to obstruct or impede Congress' certification proceeding or other government business, and the trial evidence shows they were actually quite knowledgeable on these topics. *See* Ex. 500 series. Neither expert opines that the defendants' PTSD or TBI negated their ability to know about, understand, and intend to use unlawful means, such as their trespass on Capitol Grounds, to ultimately "take" the Senate Floor, where the Electoral College Vote Process was supposed to be taking place. *See, e.g.,* Ex. 513 (Irwin interview transcript noting law enforcement's use of flashbangs, "smoke grenades, [and] CS gas."); Ex. 505 (Irwin selfie video of Senate Floor where he exclaims, "this is what you do when you take it!"). Neither expert opines that the defendants' PTSD or TBI negated their ability to know about, understand, or process their own wrongdoing, which is presumably why they omitted disclosing to the FBI and their own lawyers the details of the most egregiously violent episode of their day on January 6. And, neither expert opines that the defendants' PTSD or TBI negated their ability to know about, understand, and intend to carry their weapons as weapons, which the trial evidence shows they clearly understood. *See, e.g.,* Ex. 584 (text message video sent between defendants depicting use of object similar to Irwin's "walking stick" as martial arts weapon);

Ex. 569 (text message video sent between defendants depicting Richter's metal-tipped flagpole and black "No Quarter" flag, where Richter ominously states, "It's ready boy."); Ex. 515 (Richter interview with FBI where he repeatedly refers to metal flag tip as a "spike," and where he explains that Irwin's stick breaking incident "would have been intentional").

### C.  The Experts Should Also Be Excluded as Inappropriately Bolstering Defendants' Credibility and As Improper Hearsay Conduits.

Instead, the opinions clearly are meant to bolster the defendants' credibility by explaining why the defendants misled the FBI about how Irwin's wooden pole became broken, and why they failed to disclose the pole-smashing event even to their own lawyers. In addition, because Dr. Houchin's opinion that Irwin was suffering from "a dissociative reaction" is wholly contradicted by the ten plus years of medical records he purportedly reviewed, where Irwin was never diagnosed with or indicated any dissociative symptoms from his PTSD, that opinion, too, appears be the type of justification explanation of which courts are plainly wary. *United States v. Rogers*, 2006 WL 5249745, at *6 (D.D.C. July 17, 2006) ("Courts may exclude relevant psychiatric evidence under Rule 403 [b]ecause psychiatric evidence . . . may easily slide into wider usage that opens up the jury to theories of defense more akin to justification.").

As the court itself noted, "there's not a false statements claim, or there's nothing – there's not a count in this case in which their memory is relevant." Tr. 199:20-22. Thus, this Court should not permit the defendants' attempt to couch as mental health expertise what is clearly improper character witness testimony on credibility. *See Bassi v. Patten*, 592 F.Supp.2d 77, 84 (D.D.C. 2009) ("as a general matter, an expert may not offer opinion testimony about the credibility of parties or witnesses"); *Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 29 (D.D.C. 2007) (counsel for plaintiff may not elicit from Mr. Mamet—and Mr. Mamet may not

volunteer—testimony concerning the credibility, trustworthiness, law abidingness, character, or state of mind of any party or witness").

Similarly, this Court should not allow the defendants to use their experts as improper hearsay conduits. Federal Rule of Evidence 703 prohibits the admissibility of hearsay evidence underlying an expert's opinion unless the "probative value in helping the [trier of fact] evaluate the opinion substantially outweighs their prejudicial effect." An expert may not, however, simply act as a conduit by which hearsay evidence is transmitted to the trier of fact. *See United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (*citing United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ("When an expert is no longer applying his extensive experience and a reliable methodology, Daubert teaches that the testimony should be excluded.")).

Here, both of defendants' experts provide lengthy discussions of the defendants' traumatic military deployments, personal hardships, and family dynamics. But, as discussed extensively above, nearly all of this discussion derives from the defendants' self-serving accounts of those matters. Therefore, the probative value of such background information does not substantially outweigh its prejudicial effect, Fed. R. Evid. 703, and its inclusion would only serve to present otherwise inadmissible sympathetic information about the defendants to the trier of fact. Again, none of this information serves as a nexus to the defendants' state of mind on January 6, 2021, and whether they were capable of possessing the requisite intent under the law to commit the specific intent crimes charged. This information appears more relevant to nullification than negation of intent.

Although the threat of such prejudice is more minimal in a bench trial, the Court is still required to conduct a *Daubert* analysis and "to rely only on admissible and reliable expert testimony, even while conducting a bench trial." *See, e.g., Gonzales v. National Bd. of Med.*

28

*Exam'rs*, 225 F.3d 620, 635 (6th Cir.2000) (Gilman, J., dissenting) (listing cases). Other courts have warned about the dangers of this type of evidence: "Psychiatrists are capable of supplying *elastic descriptions of mental states that appear to, but do not truly negate the legal requirements of mens rea*." *Pohlot*, 827 F.2d at 890 (emphasis added).

### III.   If Allowed To Testify, The Expert's Testimony Should Be Limited To The Defendant's State Of Mind On January 6, 2021.

Were the Court to rule against the government and allow defendants' unqualified and unreliable experts to testify about their unscientific conclusions, their testimony must be limited to the defendants' states of mind on January 6, not the defendants' backgrounds or ancillary personal or mental health issues that have no bearing on the elements of the crimes with which they are charged. *See United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) ("When an expert is no longer applying his extensive experience and a reliable methodology, Daubert teaches that the testimony should be excluded.").

## CONCLUSION

For the reasons set forth herein, the Court should preclude the defendants' proffered expert testimony.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

BY:   /s/  *Ashley Akers*
ASHLEY AKERS
Trial Attorney
Capitol Siege Section
MO Bar No. 69601
601 D Street, N.W.
Washington, D.C. 20530

202-353-0521
Ashley.Akers@usdoj.gov

SAMANTHA R. MILLER
MATTHEW VIGEANT
Assistant United States Attorneys